## BARNETT v. HOLBROOK, CABOT & ROLLINS CORP.

(Supreme Court, Appellate Division, First Department. February 11, 1916.)

1. MASTER AND SERVANT ⬳278—GUARDING OF MACHINERY—NEGLIGENCE— EVIDENCE.

In a servant's action for injuries to his hand, by having it caught between a cog on a hoisting engine and a winch that he was attending, evidence *held* insufficient to support a finding that the cog was improperly guarded.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954, 956–958, 960–969, 971, 972, 977; Dec. Dig. ⬳278.]

2. EVIDENCE ⬳380—ADMISSIBILITY DEPENDENT ON PRELIMINARY PROOF.

In such an action, a photograph of an engine somewhat similar to that in question, showing a guard rail around the cog and extending downward beyond the winch, is inadmissible, unless it be first shown that such an engine was manufactured and used.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 1657; Dec. Dig. ⬳380.]

Dowling, J., dissenting.

Appeal from Trial Term, New York County.

Action by Enoch Barnett against the Holbrook, Cabot & Rollins Corporation. From a judgment for plaintiff, and an order denying defendant's motion for a new trial, defendant appeals. Reversed and remanded.

Argued before CLARKE, P. J., and McLAUGHLIN, LAUGHLIN, DOWLING, and SMITH, JJ.

Benjamin Patterson, of New York City, for appellant.
Sydney A. Syme, of Mt. Vernon, for respondent.

LAUGHLIN, J. The defendant was engaged in constructing part of the Catskill Aqueduct for the city of New York, and plaintiff, on

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the 17th day of February, 1914, while in its employ and working at shaft 21, about 725 feet under Clinton and South streets, in the borough of Manhattan, New York, where he had been employed for about a year, sustained personal injuries, and brought this action to recover therefor.

The tunnel was to be round and 11 feet in diameter when completed, and the inner surface was to be smooth and water-tight, and this result was to be produced by a concrete filling around the entire interior rough surface left after the excavation. In doing the concreting at the sides and roof, forms were used, and the concrete mixed at the surface of the ground was lowered through the shaft and conveyed in small iron cars, the aggregate weight of which, loaded, was about 2,400 pounds, by electric power to the point where the work was progressing, and there the cement was dumped from the cars upon platforms and shoveled into the space behind the forms. Where the work was progressing there was a platform, about 6 feet above the bed of the tunnel, upon which there had been placed an electric hoisting engine, the front end of which faced the shaft from which the cars were hauled. Across the front of the engine, above the front truck, there was a horizontal shaft, upon which there was a large drum, which was used in hauling the cars from the shaft to the level of the platform on which the engine rested, and a smaller niggerhead, or winch, which was used in dumping them. This winch was between 8 and 9 inches in length, and had a rim 2 inches in height at either end, and its diameter in the middle was 7½ inches.

The particular duties in the performance of which the plaintiff was engaged at the time of the accident were in connection with the operation of the winch to dump a car of concrete onto a platform to be used in filling a form in the arch of the tunnel. In doing this he stood upon the platform at the side of the engine, and about 1 foot from the winch. From the platform on which he stood to the arch of the tunnel there was a space of about 5 feet, and there was a space of about 2 feet between the side of the engine on which he stood and that side of the tunnel. The winch projected out from the body of the engine its entire length on the side of the engine on which he stood. A tackle was attached to one of the ribs of the form for holding cement in the arch of the tunnel, and from this a hook was suspended on the end of a steel wire cable one-half inch in diameter, and the hook was attached to the top of a car in such manner as to tilt and dump it by exerting a lifting power of about 600 pounds. This steel cable passed through the tackle only a few feet distant, and from there towards the winch, and between the tackle and the winch, a manilla rope 1 inch in diameter was attached to a loop in the end of the cable and it passed around the winch. The method of operation was for plaintiff to take two or three turns of the rope around the winch and then to stand with his right side toward the side of the engine and facing the front of the engine, so that he would be looking directly at or over the winch and toward the car which was to be dumped, and hold the slack end of the rope and signal the engineer, who was on the opposite side of the engine, but not in his view, to apply the

power, and it was his duty to hold the rope sufficiently tight, so that the friction on the winch incident to the rope having been wound around it would prevent the rope from slipping when the winch revolved. Thus, when the power was applied, the winch revolved over toward plaintiff, winding the rope over the top of it from the tackle, and unwinding also over the top the slack end which he was holding, and this he took up, changing the position of his hands, and keeping it taut, and maintaining the friction until the car was dumped, which required only a few revolutions of the winch. The testimony of the plaintiff tends to show that the winch did not revolve rapidly; but there is other testimony tending to show that it made from 100 to 160 revolutions per minute. Although the fact does not appear, I think it highly probable that the full power would not be applied in dumping cars.

The plaintiff testified in substance that he wound the rope around the winch twice and then stood in his accustomed place, holding the rope, and signaled the engineer to apply the power; that shortly after the power had been applied the steel cable reached and was being wound around the winch, and overlapped the coils of the rope, so as to bind the rope and prevent it from unwinding, and that this resulted in drawing the loose end of the rope around the winch on the under side, pulling it away from him and pulling a knot, which was in the rope against his hand, and that this knocked his right hand to his right of the winch, where it was caught and crushed between the rim of the winch and the cogs of a large gearwheel which was revolving on an axis parallel to that of the winch, but further back from the front of the winch, and in such position that the cogs *just cleared* the inner end of the winch, so that about 1 inch of the outer surface of the cogwheel was directly beyond the inner rim of the winch nearest him.

The charge of negligence against the defendant, which was *finally* left to the jury, was that this large cogwheel was not properly guarded. There were other charges of negligence concerning which evidence was offered. One of these was that the rope had been negligently spliced, leaving a large knot therein and unraveled ends, in which plaintiff had caught his thumb the day before, and that he had notified defendant's superintendent, who had promised to repair it. After the court charged the jury, leaving to them the questions of defendant's negligence with respect to guarding the machine and with respect to the condition of the rope, the attorney for the plaintiff consented that the court withdraw from the jury the consideration of the charge with respect to the defective condition of the rope, and thereupon the court withdrew that question from the jury. The defendant claimed that the accident was caused, either through the plaintiff's signaling the engineer to apply the power before he had completed winding the rope around the winch, or by his attempting to untwist or unbind the rope while the power was on. A fellow employé of the plaintiff, called by defendant, flatly contradicted the plaintiff with respect to the manner in which the accident occurred, and said that plaintiff was hold-

ing the rope in his left hand and with his right was attempting to fix the rope, which was twisted, while the machinery was in motion.

The plaintiff in his complaint, while charging the defendant with negligence in failing properly to guard the cogwheel, alleged:

That it "carelessly and negligently ordered and directed plaintiff to work upon said machine, and to engage in attaching a rope to the drum thereof, and, while plaintiff was engaged in performing said work, defendant carelessly and negligently caused and permitted the aforesaid unguarded gears and cogs to be revolved, thereby causing plaintiff's hand to be caught and causing him to be injured."

The notice of claim served on the defendant prior to the commencement of the action contained a charge in the same language. An affidavit made by plaintiff and used on an application for an order to examine the machinery contains the following:

"And while attempting to place a rope upon or around the drum of a machine used by defendant in connection with operating its cement cars in said shaft or tunnel, plaintiff's hand was caused to be caught in the gear or cogs of said machine."

[1] It is further contended on the part of the appellant that if the plaintiff's hand had been pulled or jerked by the slack end of the rope winding around the winch, as he claims, it would have been pulled towards the under side of the winch, and not thrown over and beyond the upper side, as he testified. The upper surface of the winch was revolving towards him, and the uncontroverted evidence is that, if the slack end of the rope became bound, when that point where it was bound was reached in the process of unwinding, the slack end would be drawn away from the plaintiff underneath the winch and wound around again. It is, of course, possible that if he had lost his balance his hand would not have been thrown in the direction of the under side of the winch; but he does not claim to have lost his balance. The evidence shows that this hoisting machine was of a standard make and of a kind quite extensively used in such work, and that it had a guard covering the top of the large cogwheel and extending down to within about 4 inches of the point where that wheel in its revolutions passed to a slight extent beyond the winch, as already stated.

The plaintiff testified that it was into this space, between the end of the guard and the inner rim of the winch, that his hand was thrown and caught between the cogwheel and the winch. His testimony further tends to show that, if the guard had been extended on to cover the cog wheel down to and beyond the winch, the accident would not have happened. But his testimony is not convincing on that point, and it is manifest that his fingers, if not his hand, might have been thrust in under the guard if it had extended farther, and that he would have thus sustained the same injury. Perhaps the evidence presented a question of fact for the jury as to whether the accident would have happened if the guard had been extended farther, and whether the defendant was negligent in not properly guarding the machine. But on those points we are of opinion that the verdict is clearly against the weight of evidence, particularly in view of the claim made by the plain-

tiff in his notice of claim, in his complaint, and in his affidavit, to which reference has been made.

[2] We are also of opinion that the court erred in receiving Exhibit 5, which purports to be a photograph of a stationary hoisting engine, but otherwise somewhat similar to the engine in question, and purporting by the name thereon to have been made by the same manufacturer, which shows a guard rail extending around the large cogwheel and down behind the winch. There was a sharp conflict of evidence offered in behalf of the respective parties as to whether there was any hoisting engine in general use which had a longer guard rail or one extending down to or beyond the winch. In resolving the truth from this conflicting evidence, there can be no doubt but that the photograph had great weight with the jury, for it was pointedly alluded to by counsel for the plaintiff in summing up and was referred to by the court in the charge. No foundation was laid for the introduction of this exhibit. There is no evidence that such an engine was ever actually manufactured or used.

It is sought to justify the admission of this exhibit on the ground that a witness called by the defendant, to whom it was shown on cross-examination, in answer to a question as to whether it represented the type of machine that the National Hoisting Company sold, answered, "Yes, that fairly represents their machine;" but the witness immediately thereafter, on his attention being drawn to the guard, testified that he never saw a machine with such a guard, and subsequently testified that he never saw a machine built like the one shown in the picture. The effect of the testimony of this witness was that the picture showed an engine similar to the general type of engines manufactured by the National Hoisting Company, but not with respect to the construction of the guard. If such an engine was in use anywhere, plaintiff should have proved that fact; but no attempt to do so was made, save by asking several other witnesses, called by defendant, all of whom denied ever having seen an engine so guarded. This evidence was, in the circumstances, I think, most prejudicial, and there can be little doubt but that the jury was prejudiced by the other charges and evidence of negligence which the plaintiff at the last abandoned, and by further evidence, the door for which was perhaps opened, tending to show that the defendant, immediately after the accident, drilled holes in the guard over the cogwheel and attached an extension thereto.

It follows, therefore, that the judgment and order should be reversed, and new trial granted, with costs to appellant to abide the event.

CLARKE, P. J., and McLAUGHLIN and SMITH, JJ., concur. DOWLING, J., dissents.